UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                          :
LYNK MEDIA, LLC,                                          :
                                                          :
                          Plaintiff,                      :
                                                          :          24 Civ. 583 (JPC)
              -v-                                         :
                                                          :          OPINION AND ORDER
INDEPENDENT DIGITAL NEWS AND MEDIA, LLC,  :
                                                          :
                          Defendant.                      :
                                                          :
------------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      Plaintiff Lynk Media, LLC, has brought this action against Defendant Independent Digital News and Media, LLC, alleging willful copyright infringement of five videos. The parties have cross-moved for summary judgment. Plaintiff claims that there is no genuine dispute of material fact as to Defendant's copyright infringement, that such infringement was undisputedly willful, and that Defendant's defenses of sublicense and fair use fail as a matter of law. Defendant, for its part, asserts that its defenses succeed as a matter of law and that there remains at least a genuine issue of material fact as to its willfulness.

      For the reasons that follow, the Court agrees that Defendant indisputably infringed Plaintiff's copyrights and that its defenses fail as legal matters. But the Court finds a genuine issue of material fact on willfulness. So the Court grants Plaintiff's summary-judgment motion in part and denies it in part; Defendant's cross-motion is denied in full.

# I. Background

## A.    Facts[1]

Oliya Fedun is a professional videographer whose work focuses on capturing newsworthy content and current events in order to report the news. Pl. 56.1 Stmt. ¶¶ 1, 3. Through that work, Fedun has experience licensing her videos to professional news-reporting outlets. *Id.* ¶ 2. She is a member of Plaintiff Lynk Media, LLC, and is solely responsible for Plaintiff's operations. *Id.* ¶¶ 4-5. Previously, Fedun was the sole member and employee of FNTV, LLC, Plaintiff's predecessor-in-interest. *Id.* ¶¶ 6-7.

Defendant Independent Digital News and Media, LLC is a for-profit media company associated with *The Independent*, the British online newspaper. *Id.* ¶ 8; Thomas Decl. ¶ 2. Defendant operates and supervises websites at the domains www.independent.co.uk ("English Website") and www.independentespanol.com ("Spanish Website"). Pl. 56.1 Stmt. ¶¶ 9-12.[2] Defendant requires its journalists to abide by a Code of Conduct. Thomas Decl. ¶ 4; Freeman Decl., Exh. P ("Code of Conduct"). The Code specifies that journalists must adhere to its terms along with "the general law and any other external regulations as required." Code of Conduct at

---

[1] The facts throughout this Opinion and Order are drawn from the parties' statements and counterstatements of undisputed material facts under Local Civil Rule 56.1, Dkt. 42 ("Pl. 56.1 Stmt."); Dkt. 43 ("Deft. 56.1 Counter Stmt."); Dkt. 48 ("Deft. 56.1 Stmt."); Dkt. 52 ("Pl. 56.1 Counter Stmt."), and the declarations filed by the parties with attached exhibits, Dkt. 40 ("Freeman Decl."); Dkt. 41 ("Fedun Decl."); Dkt. 45 ("Thomas Decl."); Dkt. 46 ("Griem Decl."). Unless otherwise noted, the Court cites only to a party's statement of undisputed material facts when the opposing party does not dispute the fact, has not offered admissible evidence to refute it, only adds its own "spin" on the fact, or otherwise merely disputes the inferences drawn from it.

[2] Defendant purports to dispute these facts because "Independent Digital News and Media, Ltd." operates and supervises these websites, "not Defendant." Deft. 56.1 Counter Stmt. ¶¶ 9-12 (citing Thomas Decl. ¶ 2). The cited declaration does not actually clarify this distinction—namely whether "Independent Digital News and Media, *Ltd.*" refers to *The Independent* newspaper or Defendant "Independent Digital News and Media, *LLC*." Thomas Decl. ¶¶ 1-2 (emphases added). In any event, Defendant does not explain why this distinction would be material.

IDNM000008; *see also id.* at IDNM000009 ("It is your duty to raise, in a full and frank manner and making full disclosure, any issues that could have a bearing on whether publication of any material you are involved in complies with all legal and regulatory requirements.").  In particular, the Code instructs journalists on how to "use the internet or social media to obtain material for a story," including "in terms of" the "rights over the material (*e.g.* copyright)":

> From the point of view of rights ownership, you should bear in mind that what you see online, including on social media, is not free for use just because it is free to view.  So, not only must you consider questions of accuracy and privacy, you should also assess whether material can lawfully be reproduced or even drawn on without the consent of the rights holder and whether re-use of that material may carry a fee.  In any event, you must always attribute content as fully as possible so that readers know its origins.

*Id.* at IDNM000010-000011.

This lawsuit concerns how Defendant "use[d] the internet or social media to obtain material for a story."  *Id.* at IDNM000010.  That material centers on five videos taken by Fedun.

### 1.  The Lynch Video

The first video was captured by Fedun on August 29, 2021, and involved Steven Lynch, then a candidate for office, speaking at a rally in Harrisburg, Pennsylvania (the "Lynch Video").  Pl. 56.1 Stmt. ¶ 19; Fedun Decl., Exh. 8 at LM021.  In creating the Lynch Video, "Fedun personally selected every creative element of the work including the subject matter, filming location, timing, lighting, angles, perspectives, depths, lens, and camera equipment used to capture the video recording."  Pl. 56.1 Stmt. ¶ 21.  Fedun made the Lynch Video "to document then current and newsworthy events in order to license [it] to news reporting organizations and media outlets"; said differently, she intended that the Lynch Video be used commercially and for it to be displayed and publicly distributed in the news-reporting industry.  *Id.* ¶¶ 27-28.  To that end, it is undisputed that news organizations made licensing inquiries into the Lynch Video and that licensing-agreement terms were drafted; although Defendant points out that the licensing agreement submitted by

Plaintiff was not signed by the news-organization licensee. *Id.* ¶ 29; *see also* Deft. 56.1 Counter Stmt. ¶ 29; Fedun Decl., Exh. 6 at LM015.

The same day she took the Lynch Video, Fedun posted it to her Twitter account,[3] where it has since garnered over two million views. Pl. 56.1 Stmt. ¶¶ 19-20. And on that same day, Defendant used the Twitter embedding function to post a tweet from another user's account containing the Lynch Video to its English and Spanish Websites. *Id.* ¶¶ 31, 33; Deft. 56.1 Counter Stmt. ¶¶ 31, 33. Defendant also posted a screenshot of the Lynch Video to its English Website. Pl. 56.1 Stmt. ¶ 32.

The tweet embedding the Lynch Video and the screenshot from the video are included in Defendant's article titled "Pennsylvania GOP candidate says he wants '20 strong men' to help remove school boards over Covid safety measures." Fedun Decl., Exh. 8 at LM020. The article describes comments Lynch made in the video Fedun took, before providing background information on Lynch—including the business he owned and his support of President Donald J. Trump. *Id.* at LM021-023. As the article explains, "[v]ideo of [Lynch's] comments began to spread around social media and garnered news coverage in the hours after," at which point Lynch "appeared to walk back his comment in a Facebook post stressing that he intended to follow the letter of the law." *Id.* at LM023. The article concludes by reporting on the number of COVID cases in the county where Lynch was running for office and describing national political pushback on a recommendation from the Centers for Disease Control and Prevention for students, teachers, and staff to wear masks during the school day. *Id.* at LM023-024.

On October 7, 2021, Fedun registered the Lynch Video with the United States Copyright

---

[3] Twitter has since been rebranded "X," but as the parties continue to refer to the platform as Twitter, so too does the Court. *See, e.g.*, Fedun Decl. ¶ 4 n.1; Dkt. 47 ("Deft. SJ Brief") at 4.

Office ("USCO"), where it remains on deposit, and listed FNTV (Plaintiff's predecessor-in-interest and Fedun's then-employer) as the copyright claimant. Pl. 56.1 Stmt. ¶¶ 22-24. When Fedun registered the video, she indicated that her authorship was "work made for hire" to the benefit of FNTV under the "good faith belief that she was an employee of FNTV." *Id.* ¶ 24. In June 2023, FNTV assigned the copyright to the Lynch Video, and Fedun assigned her remaining rights in the video, to Plaintiff. *Id.* ¶¶ 25-26. Plaintiff maintains that Defendant was never authorized to use the Lynch Video on its websites. *Id.* ¶¶ 34-37.

### 2. The Staten Island Video

On September 25, 2021, Fedun took the second video, which showed anti-vaccine-mandate protestors storming a vaccinated-only food court in Staten Island (the "Staten Island Video"). *Id.* ¶ 38. As with the Lynch Video, Fedun "personally selected every creative element of the work" and created it "with the intention of it being used commercially and for the purpose of display and/or public distribution in the news reporting industry." *Id.* ¶¶ 39, 45-46. Plaintiff presents an invoice from Fedun to Fox News Network for the "Staten Island Food Court Protest – Online Use, Twitter embed." Fedun Decl., Exh. 12; *see also* Pl. 56.1 Stmt. ¶ 47. That same day and the day after, Fedun repeatedly emailed Defendant's representative, Phil Thomas, noting that she had the Staten Island Video "available for licensing." Fedun Decl., Exh. 16 at IDNM000036-000039, IDNM000089-000090.

Also on September 25, Fedun posted the Staten Island Video to Twitter. Pl. 56.1 Stmt. ¶ 38. Two days later, Defendant used the Twitter embedding function to post a tweet from Fedun's account containing the Staten Island Video to its English Website, and further extracted a screenshot of the video and posted it to the website. *Id.* ¶¶ 49-50; Deft. 56.1 Counter Stmt. ¶¶ 49-50. That day—September 27, 2021—Thomas (the representative Fedun had previously emailed

about the video) messaged another employee associated with *The Independent* asking whether she had "request[ed] video for the Staten Island story." Fedun Decl., Exh. 16 at IDNM000040-000041. The next day, September 28, Defendant again used the Twitter embedding function to post the Staten Island Video on its Spanish Website. Pl. 56.1 Stmt. ¶ 51; Deft. 56.1 Counter Stmt. ¶ 51.

The tweet embedding the Staten Island Video and the screenshot from the video are included in Defendant's article titled "Staten Island crowd defies vaccine mandate by storming mall food court." Fedun Decl., Exh. 15 at LM037. The article begins by setting the scene and describing the crowd's actions and comments "according to a video from freelance journalist Oliya Scootercaster."[4] *Id.* ("Videos posted to social media show the protestors marching into Staten Island Mall in defiance of the city's indoor dining vaccination mandate.") "The anti-mandate demonstration at the mall food court," continues the article, "is the latest public instance of resistance from those opposing vaccine and mask mandates," and "shed[s] light on some of the opposition to New York City's mandate that requires proof of at least one dose of a coronavirus vaccine for various indoor activities." *Id.* at LM038. The article then situates New York City as "the first in the United States to enforce this mandate," describes then-Mayor Bill de Blasio's efforts to increase vaccinations, and elaborates on opposition to COVID mitigation measures both on Staten Island and across New York State. *Id.* It further notes that Fedun, "who was at the scene, wrote on Twitter that the dozens who entered Staten Island Mall were not asked to show vaccination cards, despite a sign at the entrance stating that it is required." *Id.* And it concludes by harkening back to an earlier incident in which "residents and business have opposed coronavirus restrictions in Staten Island." *Id.* at LM038-039.

On October 6, 2021, Fedun registered the Staten Island Video with the USCO, where it

---

[4] Fedun's personal Twitter handle is @ScooterCasterNY. *See* Fedun Decl. ¶ 30.

remains on deposit, and listed FNTV as the copyright claimant.  Pl. 56.1 Stmt. ¶¶ 40-42.  When Fedun registered the video, she indicated that her authorship was "work made for hire" to the benefit of FNTV under the "good faith belief that she was an employee of FNTV."  *Id.* ¶ 42.  In June 2023, FNTV assigned the copyright to the Staten Island Video, and Fedun assigned her remaining rights in the video, to Plaintiff.  *Id.* ¶¶ 43-44.  Plaintiff maintains that Defendant was never authorized to use the Staten Island Video on its websites.  *Id.* ¶¶ 53-56.

### 3.  The Puppy Video

On or around February 16, 2022, Fedun captured and posted to Twitter the third video: it shows a puppy guard dog on the frontlines of the war in Ukraine (the "Puppy Video").  *Id.* ¶ 57.  The Puppy Video, like the others, involved Fedun's personal selection of "every creative element of the work" and was created with the purpose to document newsworthy events in order to license the video to news organizations.  *Id.* ¶¶ 58, 63-64.  While Fedun never ultimately licensed the Puppy Video, *id.* ¶ 66, it was not for lack of trying.  Indeed, on February 28, a video journalist with Defendant reached out to Fedun to ask about the "cost to license this video for the Independent website and socials."  Fedun Decl., Exh. 21 at IDNM000047; Deft. 56.1 Counter Stmt. ¶ 65.  When Fedun responded with the price, Defendant's video journalist replied that it was "out of our budget on this occasion."  Fedun Decl., Exh. 21 at IDNM00046.

On or around the same day Defendant's video journalist and Fedun engaged on a licensing price, Defendant also used the Twitter embedding function to post a tweet from another user's account containing the Puppy Video on its English Website.  Pl. 56.1 Stmt. ¶ 67; Deft. 56.1 Counter Stmt. ¶ 67.  The article with the tweet embedding the Puppy Video is titled "Ukrainian soldiers adopt freezing puppy who now stands guard for them."  Fedun Decl., Exh. 23 at LM068.  The article reproduces comments that the soldiers "can be heard saying" in "the minute-long

video." *Id.* at LM069-070. It also notes that the "tiny black pup, with a streak of white on his belly, was seen wagging its tail" in the video. *Id.* at LM070. The article concludes by observing that the "video was shared on Reddit and several other social media platforms, where users gushed over [the puppy]," reproducing one such comment. *Id.* at LM070-071.

On March 1, 2022, Fedun emailed Defendant and explained that it did "not have permission to embed [her] tweet," especially because Defendant had "given credit to the person who stole it from [her]." Fedun Decl., Exh. 21 at IDNM000046. While Fedun followed up by claiming this message was sent to the "wrong email address" and to "disregard" it, a video editor for Defendant later forwarded Fedun's email to other employees with a message asking one of them to "sort this," "assuming the reporter embed[d]ed a 'version' of [Fedun's] video instead of her orig[inal]." *Id.* at IDNM000045.

On May 4, 2022, the Puppy Video was registered with the USCO, where it remains on deposit. Pl. 56.1 Stmt. ¶¶ 59-60. That registration lists Fedun as the author and FNTV as the copyright claimant. *Id.* ¶ 59. On May 9, 2022, Fedun assigned her rights in the Puppy Video to FNTV, and on June 6, 2023, FNTV in turn assigned the copyright to Plaintiff. *Id.* ¶¶ 61-62. Plaintiff maintains that Defendant was never authorized to use the Puppy Video on its English website. *Id.* ¶¶ 68-71.

### 4.  The AOC Video

The fourth video—which depicts footage from an event by Congresswoman Alexandria Ocasio-Cortez (the "AOC Video")—was captured and published on Twitter by Fedun on October 19, 2022. *Id.* ¶ 72. As with the other videos, Fedun intended that it be licensed and then displayed and distributed in the news-reporting industry. *Id.* ¶¶ 76-77. Plaintiff presents evidence of invoices from Fedun to Fox News Network for a service titled "AOC Event Disrupted by Protests,"

Fedun Decl., Exh. 27 at LM086-087, and from Fedun to Newsmax for a service titled "AOC Listening Forum Disrupted by Protestors," *id.* at LM102-103.  According to Fedun, she "also commercially licensed" the AOC Video to the *New York Post*, which published the video on its website.  Fedun Decl. ¶ 61.

The next day, Defendant used the Twitter embedding function to post tweets from Fedun's account containing the AOC Video to its English and Spanish Websites.  Pl. 56.1 Stmt. ¶¶ 81-82; Deft. 56.1 Counter Stmt. ¶¶ 81-82.  The article containing those embedded tweets is titled "AOC subdues chanting hecklers by dancing at raucous town hall meeting."  Fedun Decl., Exh. 30 at LM091.  It describes Congresswoman Ocasio-Cortez's actions—like dancing to the beat of the hecklers' drumming and chanting—and her statements as depicted in the video.  *Id.* at LM091-092.  It further references another event of hers that had been disrupted by protestors days earlier, observes that her "brief career in public service has been marked by an atypical level of interest from conservatives" (and adds that "[s]ome have speculated" that such focus "is due in part to her relative youth, gender, and race"), and concludes with a brief analysis of her re-election prospects. *Id.*

On November 9, 2022, the AOC Video was registered with the USCO, listing Fedun as the author and FNTV as the copyright claimant.  Pl. 56.1 Stmt. ¶ 73.  That registration remains on deposit with the USCO.  *Id.* ¶ 74.  Fedun had previously assigned her copyrights in the AOC Video to FNTV on October 20, 2022.  *Id.* ¶ 75.  While, unlike with the other videos, Plaintiff's Local Civil Rule 56.1 statement does not explicitly state that FNTV assigned its copyright in the AOC Video to Plaintiff, the copyright assignment agreement between FNTV and Plaintiff purports to cover all of FNTV's copyrights, *see* Fedun Decl., Exh. 4 at LM316; nor does Defendant dispute that this copyright is Plaintiff's.  Plaintiff maintains that Defendant was never authorized to use

the AOC Video on its websites.  Pl. 56.1 Stmt. ¶¶ 83-86.

### 5. The Protest Video

The fifth video at issue was taken by Fedun on October 9, 2023.  *Id.* ¶ 87.  That video, which Fedun also posted on Twitter, depicts the flags of the Soviet Union and China being displayed at a pro-Palestine protest outside the United Nations (the "Protest Video"; collectively, with the Lynch Video, the Staten Island Video, the Puppy Video, and the AOC Video, the "Videos").  *Id.*  Once more, Fedun "personally selected every creative element" of the Protest Video and intended that it be used commercially as licensed by news-reporting organizations.  *Id.* ¶¶ 91-93.  Plaintiff presents evidence of invoices from Fedun to Fox News Network.  Fedun Decl., Exh. 35 at LM130-131.

A few days later, Defendant used the Twitter embedding function to post a tweet from Fedun's account containing the Protest Video to its English Website.  Pl. 56.1 Stmt. ¶ 96; Deft. 56.1 Counter Stmt. ¶ 96.  The article including that embedded tweet is titled "Police around world brace for days of pro-Palestinian protests."  Fedun Decl., Exh. 37 at LM120.  As it begins, "[l]aw enforcement agencies across the world are preparing for a series of demonstrations in support of the Palestinian cause," and "police across the UK, Australia and New York City are among those entering a state of heightened readiness."  *Id.* at LM121.  It further explains that the New York City Police Department had "cancelled all time off for officers" ahead of a suspected day of protest, elaborates that protest had been suspected because of a "call[] for global protests by an ex-Hamas chief," and then reports on the suspected protests in the UK and Australia.  *Id.* at LM121-123.  Fedun's tweet capturing the Protest Video is embedded, although the article does not further discuss the events in that video.  *Id.* at LM123.

The Protest Video was registered at the USCO on December 2, 2023—where it remains on

deposit—and lists Fedun as the author and Plaintiff as the copyright claimant. Pl. 56.1 Stmt. ¶¶ 88-89. Fedun had assigned the video's copyright to Plaintiff on June 5, 2023. *Id.* ¶ 90. Plaintiff maintains that Defendant was not authorized to use the Protest Video on its English Website. *Id.* ¶¶ 97-100.

### 6. Relevant Terms of Twitter's User Agreement

Across all five Videos rest disagreements about terms in Twitter's User Agreement as they relate to embedded tweets. There are no factual disputes as to how embedded tweets generally work: they allow certain users to place content from Twitter—including "photos [and] video . . . created for display on [Twitter]"—into the users' "website articles." Freeman Decl., Exh. K (Twitter's Developer Platform: "Embedded Tweets") at LM269. An embedded tweet "consists of two parts," namely an "HTML snippet hosted in [a user's] web page" and Twitter's "JavaScript to transform that code into a fully-rendered Tweet." *Id.* A user "can copy embedded Tweet markup generated from the Tweet menu," "paste a URL into a supporting [content management system]," or "add a Tweet to the page programmatically using a JavaScript factory function." *Id.* As Twitter explains, "[e]very Tweet displayed" includes "an embed code to easily copy-and-paste into [the user's] webpage." *Id.* at LM270.[5] By default, media included in tweets like photos or videos are

---

[5] "Most social media sites," another judge in this District ably explained, "provide code that coders and web designers can easily copy in order to enable embedding on their own webpages." *Goldman v. Breitbart News Network, LLC*, 302 F. Supp. 3d 585, 587 (S.D.N.Y. 2018). In more generic terms:

> "Embedding" an image on a webpage is the act of a coder intentionally adding a specific "embed" code to the HTML instructions that incorporates an image, hosted on a third-party server, onto a webpage. To embed an image, the coder or web designer would add an "embed code" to the HTML instructions; this code directs the browser to the third-party server to retrieve the image. An embedded image will then hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website. The result: a seamlessly integrated webpage, a mix of text and images, although the underlying images may be hosted in varying locations. *Id.*

"displayed in embedded Tweets" but can be hidden "if editorially desired."  *Id.* at LM271-272.

There is, however, a purported dispute as to which users can embed tweets, and under what conditions—implicating Twitter's Terms of Service, contained in its User Agreement.  Under the Terms of Service undisputedly applicable when the five Videos were taken by Fedun and embedded in Defendant's articles:

> If you use *developer features* of the Services, including but not limited to Twitter for Websites . . . , Twitter Cards . . . , Public [application programming interface ("API")] . . . , or Sign in with Twitter . . . , *you agree to our Developer Agreement . . . and Developer Policy* . . . .  If you want to reproduce, modify, create derivative works, distribute, sell, transfer, publicly display, publicly perform, transmit, or otherwise use the Services or Content on the Services, you must use the interfaces and instructions we provide, except as permitted through the Twitter Services, these Terms, or the terms provided on https://developer.twitter.com/en/developer-terms.

Freeman Decl., Exh. B (Twitter's Terms of Service, version 16) ¶ 4 (emphases added); *accord* Freeman Decl., Exh. C (Twitter's Terms of Service, version 17) ¶ 4; Freeman Decl., Exh. D (Twitter's Terms of Service, version 18) ¶ 4; *see also* Griem Decl., Exh. 1 ¶ 4 (Twitter's Terms of Service effective September 29, 2023; changed from Twitter to X).  Plaintiff submits evidence suggesting that embedding tweets into a user's "website articles" is a Developer feature, Freeman Decl., Exh. K (Twitter's Developer Platform: "Embedded Tweets") at LM269; Freeman Decl., Exh. G (Twitter's Developer Platform: "X for Websites") at LM199, such that "Defendant must factually prove that it qualifies as a 'Developer' first before it would be able to avail itself of the embed function in connection with an external website," Dkt. 39 ("Pl. SJ Brief") at 21.  *See also* Freeman Decl., Exh. I (Twitter's Developer Platform: "Display Requirements") at LM211 (acknowledging that it may "not [be] possible for you to use our embedding features," in which case "you must follow [certain] requirements . . . when displaying posts and timelines online").  Under the Developer Agreement and Policy, Twitter "grants"—subject to one's "compliance with the terms of this Agreement and the applicable Incorporated Developer Terms"—a "non-

exclusive, royalty free, non-transferable, non-sublicensable, revocable license to" use Twitter's APIs to "integrate X[/Twitter] Content into your Services," including websites, and "[c]opy a reasonable amount of and display the X[/Twitter] Content on and through your Services to Users, as permitted by this Agreement."  Freeman Decl., Exh. E ("Developer Agreement") at 6-7.  That Agreement contemplates Developers "embed[ding] or display[ing] Posts," for which a Developer must contact Twitter about the API if the Developer's "site exceeds 10 million daily impressions." *Id.* at 34.

Defendant, for its part, claims that "every publicly accessible Tweet includes an embed code that can be easily copy-and-pasted into a webpage so as to transform the code into a fully rendered Tweet on the webpage," Griem Decl. ¶ 5, such that "[a]ny individual may embed a publicly accessible Tweet using publish.twitter.com without being required to setup any account with Twitter/X," Deft. 56.1 Stmt. ¶ 104.

Defendant thus points to language in Twitter's general Terms of Service which it claims grants it a sublicense to use tweets like Fedun's and the Videos therein:

> By submitting, posting or displaying Content on or through the Services, *you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense)* to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed (for clarity, these rights include, for example, curating, transforming, and translating).  This license authorizes us to make your Content available to the rest of the world and to let others do the same.  You agree that this license includes the right for Twitter to provide, promote, and improve the Services and to make Content submitted to or through the Services available to other companies, organizations or individuals for the syndication, broadcast, distribution, Retweet, promotion or publication of such Content on other media and services, subject to our terms and conditions for such Content use.  Such additional uses by Twitter, or other companies, organizations or individuals, is made with no compensation paid to you with respect to the Content that you submit, post, transmit or otherwise make available through the Services as the use of the Services by you is hereby agreed as being sufficient compensation for the Content and grant of rights herein.

. . .

> You represent and warrant that you have, or have obtained, all rights, licenses, consents, permissions, power and/or authority necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services. You agree that such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission or are otherwise legally entitled to post the material and to grant Twitter the license described above.

Freeman Decl., Exh. B ¶ 3 (emphasis added); *accord* Freeman Decl., Exh. C ¶ 3; Freeman Decl., Exh. D ¶ 3; *see also* Griem Decl., Exh. 1 ¶ 3 (changed from Twitter to X).

Defendant claims that such a broad reading of Twitter's Terms of Service is supported by other language within Twitter's Privacy Policy, also contained in its User Agreement:

> By publicly posting content, you are directing us to disclose that information as broadly as possible, including through our APIs, and directing those accessing the information through our APIs to do the same. *To facilitate the fast global dissemination of Tweets to people around the world, we use technology like application programming interfaces (APIs) and embeds to make that information available to websites, apps, and others for their use - for example, displaying Tweets on a news website or analyzing what people say on Twitter.* We generally make this content available in limited quantities for free and charge licensing fees for large-scale access. We have standard terms that govern how this data can be used, and a compliance program to enforce these terms. But these individuals and companies are not affiliated with Twitter, and their offerings may not reflect updates you make on Twitter. For more information about how we make public data on Twitter available to the world, visit https://developer.twitter.com.

Freeman Decl., Exh. B ¶ 1.2 (emphasis added); *accord* Freeman Decl., Exh. C ¶¶ 3.1, 3.2; Freeman Decl., Exh. D ¶¶ 3.1, 3.2.

Plaintiff presents further material from Twitter warning users—including Twitter Developers—that "in some cases, permission from the original content creator may still be necessary, as X[/Twitter] does not provide permission to use third party/user content." Freeman Decl., Exh. I (Twitter's Developer Platform: "Display Requirements") at LM209. Indeed, as Twitter's Terms of Service provide: "You retain your rights to any Content you submit, post or display on or through the Services. What's yours is yours—you own your Content (and your

incorporated audio, photos and videos are considered part of the Content)."  Freeman Decl., Exh. B ¶ 3; *accord* Freeman Decl., Exh. C ¶ 3; Freeman Decl., Exh. D ¶ 3; *see also* Griem Decl., Exh. 1 ¶ 3 (changed from Twitter to X).

## B.    Procedural History

Plaintiff initiated this case on January 26, 2024, Dkt. 1, and filed its Amended Complaint on April 17, 2024, Dkt. 17.  The Amended Complaint alleges one claim of direct copyright infringement and seeks actual damages and profits or, in the alternative, statutory damages for willful infringement.  *Id.* ¶¶ 81-90 (citing 17 U.S.C. §§ 501 *et seq.*).  Defendant moved to dismiss the Amended Complaint on May 9, 2024, raising the defenses of license and fair use.  Dkts. 20-22.  While the motion to dismiss was pending, the parties proceeded to fact discovery, which was completed on September 23, 2024.  *See* Dkts. 19, 29.  Following the close of discovery, the parties expressed their intents to move for summary judgment.  Dkts. 30, 35.  Given the anticipated summary-judgment motions, and as discussed with the parties at a conference on October 8, 2024, the Court dismissed without prejudice Defendant's then-pending Rule 12(b)(6) motion.  Dkt. 36.

On November 12, 2024, Plaintiff moved for summary judgment as to liability for copyright infringement under 17 U.S.C. § 501 and willfulness under 17 U.S.C. § 504(c).  Dkts. 38-42.  On December 3, 2024, Defendant opposed Plaintiff's motion and cross-moved for summary judgment, asserting the defenses of sublicense and fair use.  Dkts. 43-48.  Plaintiff filed its reply and opposition to Defendant's cross-motion on December 24, 2024.  Dkts. 51 ("Pl. SJ Reply"), 52. Defendant filed its cross-motion reply on January 10, 2025.  Dkt. 54 ("Deft. Cross Motion Reply"). Plaintiff filed notices of supplemental authority on January 6 and May 29, 2025.  Dkts. 53, 55. Defendant responded to Plaintiff's second notice of supplemental authority on June 6, 2025.  Dkt. 56.

## II.  Standard of Review

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is appropriate '[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 620 (2d Cir. 2016) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  "A genuine dispute exists where 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party,' while a fact is material if it 'might affect the outcome of the suit under the governing law.'"  *Chen v. 2425 Broadway Chao Rest., LLC*, No. 16 Civ. 5735 (GHW), 2019 WL 1244291, at *4 (S.D.N.Y. Mar. 18, 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In conducting this review, the Court must "resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party."  *Mhany Mgmt.*, 819 F.3d at 620.

"The movant bears the initial burden of demonstrating 'the absence of a genuine issue of material fact,' and, if satisfied, the burden then shifts to the non-movant to present 'evidence sufficient to satisfy every element of the claim.'"  *Chen*, 2019 WL 1244291, at *4 (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008)).  The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," and "must offer some hard evidence showing that its version of the events is not wholly fanciful."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal quotation marks and citations omitted).  The non-movant must present more than a "scintilla of evidence" to survive summary judgment.  *Anderson*, 477 U.S. at 252.  "Where no rational finder of fact could find in favor of the nonmoving party because the evidence to support its case is so slight, summary judgment must be granted."  *Brown v. Eli*

*Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (internal quotation marks and citation omitted).

Generally, a court evaluates each cross-motion for summary judgment independently of the other, considering the facts in the light most favorable to the non-moving party. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). But if a "motion and cross-motion seek a determination of the same issues," as with Defendant's fair-use and sublicense affirmative defenses, "the Court may consider them together." *ExteNet Sys., Inc. v. Vill. of Pelham*, 377 F. Supp. 3d 217, 223 (S.D.N.Y. 2019).

### III.  Discussion

The Court first considers whether Plaintiff has established a *prima facie* case of copyright infringement before turning to the defenses of sublicense and fair use.

### A.    Plaintiff Has Undisputedly Established a *Prima Facie* Copyright Infringement Claim

The Copyright Act reserves to copyright owners a bundle of "exclusive rights" to the works that they own, including the rights of reproduction, distribution, public display, and preparation of derivative works. 17 U.S.C. § 106. The statute also provides copyright owners a private right of action for copyright infringement against "[a]nyone who violates any of the exclusive rights" guaranteed by Section 106. *Id.* § 501(a)-(b). To prevail on that cause of action, the rightsholder must prove: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Ferdman v. CBS Interactive Inc.*, 342 F. Supp. 3d 515, 524 (S.D.N.Y. 2018) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). A certificate of copyright registration issued by the USCO "constitute[s] *prima facie* evidence of the validity not only of [one's] copyrights, but also of the originality of [one's] works." *E.g.*, *Boisson v. Banian, Ltd.*, 273 F.3d 262, 267-68 (2d Cir. 2001).

There is no genuine factual dispute that Plaintiff has established the elements of a copyright

infringement claim; nor does Defendant assert that such a dispute exists. For all five Videos, Plaintiff possesses valid copyright registrations with the USCO. Pl. 56.1 Stmt. ¶¶ 22-26 (Lynch Video); *id.* ¶¶ 40-44 (Staten Island Video); *id.* ¶¶ 59-62 (Puppy Video); *id.* ¶¶ 73-75 (AOC Video); *id.* ¶¶ 88-90 (Protest Video). While the presumptions of valid copyrights and originality afforded by a copyright registration "may be rebutted," *Boisson*, 273 F.3d at 267-68, Defendant makes no effort to rebut them. Indeed, the Videos are undoubtedly original, in that they were "independently created by" Fedun and "possess[] at least some minimal degree of creativity." *Feist Publ'ns*, 499 U.S. at 345. For four of the Videos, "Fedun personally selected every creative element of the work including the subject matter, filming location, timing, lighting, angles, perspectives, depths, lens, and camera equipment used to capture the video recording." Pl. 56.1 Stmt. ¶ 21 (Lynch Video); *id.* ¶ 39 (Staten Island Video); *id.* ¶ 58 (Puppy Video); *id.* ¶ 91 (Protest Video); *see also id.* ¶ 72 ("On or about October 19, 2022, Fedun captured and first published to Twitter [the AOC Video].") And it is undisputed that Defendant copied those original Videos wholesale by embedding within its articles the tweets in which the Videos were displayed. *Id.* ¶¶ 31-33 (Lynch Video); *id.* ¶¶ 49-51 (Staten Island Video); *id.* ¶ 67 (Puppy Video); *id.* ¶¶ 81-82 (AOC Video); *id.* ¶ 96 (Protest Video). Defendant expressly disclaims arguing "that there is no [infringement] liability" because it embedded tweets—meaning that "the videos at issue were actually stored on Twitter's servers"—rather than copying the Videos directly. Deft. Cross Motion Reply at 15.[6]

---

[6] District courts in this Circuit have rejected the so-called "Server Test, where whether a website publisher is directly liable for infringement turns entirely on whether the image is hosted on the publisher's own server, or is embedded or linked from a third-party server." *Goldman*, 302 F. Supp. 3d at 590-96; *see also, e.g.*, *McGucken v. Newsweek LLC* ("*McGucken III*"), No. 19 Civ. 9617 (KPF), 2022 WL 836786, at *5-6 (S.D.N.Y. Mar. 21, 2022); *Nicklen v. Sinclair Broad. Grp., Inc.*, 551 F. Supp. 3d 188, 193-96 (S.D.N.Y. 2021). The Ninth Circuit, by contrast, has adopted that test. *E.g.*, *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1068-77 (9th Cir. 2023); *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1159-62 (9th Cir. 2007). In light of Defendant's disclaimer, the Court need not weigh in on this debate. *See Walsh v. Townsquare Media, Inc.*, 464 F. Supp.

In posting Plaintiff's Videos to its website without Plaintiff's permission, Defendant "violated at least [Plaintiff]'s exclusive rights to reproduce, publicly display, and create derivatives of those works." *Nixon v. Source Digit., Inc.*, No. 23 Civ. 5218 (JPC), 2024 WL 5202514, at *4 (S.D.N.Y. Dec. 23, 2024). As "there is no genuine dispute of material fact as to the validity of [Plaintiff]'s ownership of the [Videos] or as to [Defendant]'s encroachment on [Plaintiff]'s exclusive rights in them," Plaintiff "has established the elements of a copyright infringement claim against" Defendant. *Id.* The Court thus considers Defendant's two defenses to copyright infringement: sublicense and fair use.

**B.    Sublicense**

The parties disagree on whether Defendant had a valid sublicense from Twitter to embed tweets containing the Videos within its articles. "It is well established that a copyright owner may license his or her rights in copyrighted material, including the rights of use, distribution, and sublicensing, to one or more parties." *Sinclair v. Ziff Davis, LLC*, 454 F. Supp. 3d 342, 344 (S.D.N.Y. 2020); *accord Davis v. Blige*, 505 F.3d 90, 98 (2d Cir. 2007). "A valid license to use the copyrighted work 'immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor.'" *Spinelli v. NFL*, 903 F.3d 185, 197 (2d Cir. 2018) (quoting *Davis*, 505 F.3d at 100). With proper authorization, a copyright licensee can, in turn, issue a sublicense, shielding the sublicensee from copyright infringement liability. *See, e.g.*, *id.* at 203; 2 Patry on Copyright § 5:127 (2025). The "possession of an applicable license"—including a sublicense—is "generally viewed as an affirmative defense to a claim of copyright infringement, and is a defense that the alleged infringer must plead and prove." *Yamashita v. Scholastic, Inc.*, 936 F.3d 98, 104 (2d Cir. 2019); *accord United States v.*

3d 570, 580 n.6 (S.D.N.Y. 2020).

*Larracuente*, 952 F.2d 672, 673-74 (2d Cir. 1992); *see also McGucken III*, 2022 WL 836786, at *6-7.

There are two types of sublicense: express and implied.  *See, e.g.*, *Monroe v. Buzzfeed, Inc.*, No. 23 Civ. 6234 (CM), 2024 WL 4350964, at *3-4 (S.D.N.Y. Sept. 30, 2024); *McGucken III*, 2022 WL 836786, at *6-9; 2 Patry on Copyright § 5:131.10 (2025).  Defendant argues only that it holds an express sublicense drawn from Twitter's Terms of Service and Developer Agreement.  *See* Deft. SJ Brief at 14-15; Deft. Cross Motion Reply at 3-4.  The Court thus considers only whether Defendant possessed an express sublicense to display Plaintiff's copyrights via embedded tweets.[7]

On that score, Defendant starts behind the eight ball.  Recall Twitter's Terms of Service, which specify that "[b]y submitting, posting or displaying Content on or through the Services, *you grant us a worldwide, non-exclusive, royalty-free license (with the right to sublicense)* to use, copy, reproduce, process, adapt, modify, publish, transmit, display and distribute such Content in any and all media or distribution methods now known or later developed . . . ."  Freeman Decl., Exh. B ¶ 3 (emphasis added); *accord* Freeman Decl., Exh. C ¶ 3; Freeman Decl., Exh. D ¶ 3; *see also* Griem Decl., Exh. 1 ¶ 3 (changed from Twitter to X).  "By their express language, Twitter's terms

---

[7] The Second Circuit has "not yet ruled 'on the precise circumstances under which an implied non-exclusive license will be found,'" although at minimum there must be a "meeting of the minds between the parties to permit the particular usage at issue."  *ABKCO Music, Inc. v. Sagan*, 50 F.4th 309, 320 (2d Cir. 2022) (quoting *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 120, 124 (S.D.N.Y. 2012)).  The Court observes that several of its peers in this Circuit have rejected the argument that any copyright holder's "post[ing of] his copyrighted material onto a social media platform" constitutes a meeting of the minds such that it effectively "waive[s]" the poster's "copyright to the material."  *Graham v. Prince*, No. 15 Civ. 10160 (SHS), 2023 WL 3383029, at *23 (S.D.N.Y. May 11, 2023); *see, e.g.*, *Monroe*, 2024 WL 4350964, at *4; *Shihab v. Complex Media, Inc.*, No. 21 Civ. 6425 (PKC), 2022 WL 3544149, at *3 (S.D.N.Y. Aug. 17, 2022).  *But see McGucken III*, 2022 WL 836786, at *8-9 (holding that "a reasonable juror could conclude that Instagram did, or did not, grant Defendant an implied sublicense to embed Plaintiff's Instagram Post").

grant a license to use content only to Twitter," and grant Twitter only the *right* to sublicense to others. *Agence France Presse v. Morel*, 769 F. Supp. 2d 295, 302-03 (S.D.N.Y. 2011); *accord Lynk Media LLC v. Mediaite, LLC*, No. 24 Civ. 29 (PKC), 2025 WL 89226, at *5-6 (S.D.N.Y. Jan. 14, 2025). While Defendant points to the Terms of Service's immediately following language— that "[t]his license authorizes us to make your Content available to the rest of the world and to let others do the same," *e.g.*, Freeman Decl., Exh. B ¶ 3—such "permissive language stands in contrast to the express, mandatory terms conferring a 'license' . . . on Twitter." *Agence France Presse*, 769 F. Supp. 2d at 302-03.[8] So "even if X's[/Twitter's] Terms of Service establish that [Plaintiff] granted a license to X[/Twitter] by posting the Video[s], they do not establish that X[/Twitter] granted a sublicense to [Defendant]." *Ong v. Townsquare Media, Inc.*, No. 24 Civ. 3877 (RA), 2025 WL 2294867, at *3 (S.D.N.Y. Aug. 8, 2025).

Defendant points to no judicial decision finding an express license under Twitter's User Agreement or under any similarly worded terms of service. *See Yang v. Townsquare Media, Inc.*, No. 24 Civ. 3841 (VM) (HJR), 2024 WL 4706892, at *1-2 (S.D.N.Y. Nov. 7, 2024) (observing that the party relying on an embedded-tweet sublicense defense under Twitter's Terms of Service "has not cited any case in which a copyright defendant demonstrated that it had an analogous sublicense from a social media platform"). To the contrary, courts in this District have uniformly rejected the existence of such a license at both the motion-to-dismiss and summary-judgment postures. *See, e.g.*, *Ong*, 2025 WL 2294867, at *3 (Twitter; motion to dismiss); *Lynk Media*, 2025 WL 89226, at *5-6 (Twitter; motion to dismiss); *Agence France Presse*, 769 F. Supp. 2d at 302-

---

[8] The same is true of language from the Privacy Policy in Twitter's User Agreement, which states that Twitter "use[s] technology like application programming interfaces (APIs) and embeds to make that information available to websites, apps, and others for their use - for example, displaying Tweets on a news website or analyzing what people say on Twitter." *E.g.*, Freeman Decl., Exh. B ¶ 1.2.

03 (Twitter; motion to dismiss); *Monroe*, 2024 WL 4350964, at *3-4 (Facebook; motion to dismiss); *McGucken III*, 2022 WL 836786, at *6-8 (Instagram; summary judgment); *Sinclair v. Ziff Davis, LLC*, No. 18 Civ. 790 (KMW), 2020 WL 3450136, at *1-2 (S.D.N.Y. June 24, 2020) (Instagram; motion to dismiss); *McGucken v. Newsweek LLC* ("*McGucken I*"), 464 F. Supp. 3d 594, 603-04 (S.D.N.Y. 2020) (Instagram; motion to dismiss).[9]

Indeed, Twitter's Terms of Service stand in stark contrast to those of YouTube, under which another judge in this District found an "explicit[] and unambiguous[]" sublicense "to embed the [copyrighted] video" and thus granted a motion to dismiss a copyright infringement claim based on such embedding. *Richardson v. Townsquare Media, Inc.*, No. 24 Civ. 4217 (AKH), 2025 WL 89191, at *4 (S.D.N.Y. Jan. 14, 2025). In *Richardson*, not only did a user "grant to YouTube a worldwide, non-exclusive, royalty-free, sublicensable and transferable license to use [the user's] Content," the user also "grant[ed] *each other user* of the Service a worldwide, non-exclusive, royalty-free license to access [the user's] Content through the Service, and to use that Content, including to reproduce, distribute, prepare derivative works, display and perform it, only as enabled by a feature of the Service (*such as* video playback *or embeds*)." *Id.* (emphases added) (citation omitted). Put differently, YouTube's terms of service granted YouTube a license and authorized YouTube to sublicense to others, and then YouTube "explicitly and unambiguously" *exercised that authority* by granting other YouTube users a sublicense which "clearly extends to embedding." *Id.* Twitter's Terms of Service do no such thing.

Perhaps sensing that the Terms of Service do not suffice to grant an explicit sublicense,

---

[9] Courts in other Circuits have likewise declined to find such an express license without further evidence. *See, e.g.*, *Breeden Media LLC v. Daily Wire, LLC*, No. 3:24-cv-00723, 2024 WL 5239886, at *2-4 (M.D. Tenn. Dec. 27, 2024) (Twitter; motion to dismiss); *Babcock v. Gannett Satellite Info. Network, LLC*, No. 4:20-CV-23-HAB, 2021 WL 534754, at *4-5 (N.D. Ind. Feb. 12, 2021) (same).

Defendant tries a different tack: it points to Twitter's Developer Agreement and Policy as Twitter actually exercising its right to sublicense, including through embedded tweets. *See* Deft. Cross Motion Reply at 2. But that position runs into two problems. First, the "License from X[/Twitter]" contemplated in the Developer Agreement and Policy does not expressly contemplate embedded tweets: unlike the "License *to* X[/Twitter]" in which Developers "grant X[/Twitter] a non-exclusive, royalty free, non-transferable, non-sublicensable revocable license to access . . . any webpage or applications on which you display X[/Twitter] Content *using embedded posts*," the license from Twitter merely grants Developers a license to "[u]se the X[/Twitter] API to integrate X[/Twitter] Content into your Services . . . as explicitly approved by X[/Twitter]" or to "[c]opy a reasonable amount of and display the X[/Twitter] Content on and through your Services to Users, as permitted by this Agreement."  Developer Agreement ¶¶ II.A, II.B (emphases added).  The Developer Agreement is hardly a clear sublicense for users like Defendant to embed Videos on its website.  *Compare Yang*, 2024 WL 4706892, at *2 ("The authenticity and applicability of [Twitter's] Developer Agreement and Policy is a valid subject for fact discovery."), *with Richardson*, 2025 WL 89191, at *4 ("Under YouTube's Terms of Service, when a user uploads a video to YouTube, YouTube is granted a broad license and YouTube's users are granted a sublicense[.]").

Second, and more fundamentally, even if the Developer Agreement and Policy were to expressly establish a sublicense between Twitter and Developers, Defendant presents no evidence that it "is party to the Developer Agreement."  *Cf. Ong*, 2025 WL 2294867, at *3 (declining to credit, at the motion to dismiss stage, the defendant's "reli[ance] on X's Developer Agreement, which it argues establishes a sublicense between itself and X," because the plaintiff had "not alleged that [the defendant] is party to the Developer Agreement" (citation omitted)).  Instead,

Defendant says only that it "received a sublicense from Twitter when it agreed to the Developer Agreement and Developer Policy *by using Twitter for Websites features like embedding*." Deft. Cross Motion Reply at 2 (emphasis added). But the ability to embed tweets is not the same as "a policy or agreement that establishes any entity's legal rights or obligations." *McGucken v. Newsweek LLC* ("*McGucken II*"), No. 19 Civ. 9617 (KPF), 2020 WL 6135733, at *2-3 (S.D.N.Y. Oct. 19, 2020). Indeed, if, as Defendant claims, "[a]ny individual may embed a publicly accessible Tweet," Deft. 56.1 Stmt. ¶ 104, that would seemingly render a Developer-specific agreement superfluous. *But see* Freeman Decl., Exh. K (Twitter's Developer Platform: "Embedded Tweets") at LM269 (suggesting that embedding tweets into website articles is a Developer feature); Freeman Decl., Exh. G (Twitter's Developer Platform: "X for Websites") at LM199 (similar). Defendant cannot leverage the Developer Agreement and Policy into an explicit and unambiguous sublicense. *Cf. Richardson*, 2025 WL 89191, at *4.

Ultimately, a reasonable factfinder could easily "conclude" that Twitter's Terms of Service and its Developer Agreement and Policy "did not unambiguously grant Defendant a sublicense permitting it to embed Plaintiff's [Twitter] Post," so "Defendant is not entitled to summary judgment on the theory that it had an express sublicense to embed Plaintiff's post." *McGucken III*, 2022 WL 836786, at *8. The question, then, is whether "a reasonable factfinder could conclude" that Twitter's various terms and policies "*did* grant Defendant such a sublicense," such that "Plaintiff is not entitled to summary judgment on [its] claim of copyright infringement." *Id.* (denying the plaintiff's motion for summary judgment under Instagram's then-applicable terms of service).

Three reasons persuade this Court that Plaintiff is entitled to summary judgment as to Defendant's sublicense defense. The first two are aspects of Twitter's terms that lead the Court to

conclude that the terms unambiguously did *not* grant Defendant a sublicense.  First, the Terms of Service require a representation that users "have . . . all rights, licenses, [etc.] . . . necessary to grant the rights granted herein for any Content that you submit, post or display on or through the Services," and that "such Content will not contain material subject to copyright or other proprietary rights, unless you have necessary permission," *e.g.*, Freeman Decl., Exh. B ¶ 3; the *McGucken III* court indicated that if such language had been present in Instagram's policies then under consideration, its summary-judgment disposition would have come out differently.  2022 WL 836786, at *8 n.6 (citing *Hunley v. BuzzFeed, Inc.*, No. 20 Civ. 8844 (ALC), 2021 WL 4482101, at *1 n.2 (S.D.N.Y. Sept. 30, 2021)).  Second, Twitter warns Developers (and possibly all users) that it "does not provide permission to use third party/user consent."  Freeman Decl., Exh. I (Twitter's Developer Platform: "Display Requirements") at LM209.  As Plaintiff points out, this language "conflicts with" Defendant's position that Twitter's terms "authorize[] Defendant's unconditional use of Plaintiff's Videos on Defendant's external websites."  Pl. SJ Reply at 29 (emphasis omitted).

Third, and finally, even if Twitter's terms were ambiguous, when a "moving party's case hinges on ambiguous contract language, summary judgment may be granted only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case."  *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008).  Here, Defendant forewent introducing any extrinsic evidence in discovery, asserting that "[n]o external evidence is needed."  Deft. Cross Motion Reply at 2.  As Defendant has produced no more than a scintilla of evidence on an issue as to which it bears the ultimate burden, *see Larracuente*, 952 F.2d at 673-74 (existence of sublicense is an affirmative defense), Plaintiff is

entitled to summary judgment on Defendant's sublicense defense.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).[10]

## C.    Fair Use

Defendant also asserts a fair-use defense, which Plaintiff claims fails as a matter of law. Consistent with copyright law's fundamental purpose of "promot[ing] the Progress of Science and useful Arts," U.S. Const., Art. I, § 8, cl. 8, the Copyright Act allows would-be infringers to assert a defense of "fair use."  *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 575 (1994).  Section 107 of the Copyright Act, which "indicates, rather than dictates, how courts should apply" the fair-use doctrine, provides a non-exclusive list of non-dispositive factors that typically comprise the core of the analysis:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

*Google LLC v. Oracle Am., Inc.*, 593 U.S. 1, 18-19 (2021) (quoting 17 U.S.C. § 107) (internal quotation marks omitted).  The "four statutory fair use factors may not 'be treated in isolation, one from another.  All are to be explored, and the results weighed together, in light of the purposes of copyright.'"  *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith* ("*Warhol II*"), 598 U.S. 508, 550-51 (2023) (quoting *Campbell*, 510 U.S. at 578).  In other words, "[t]he fair use doctrine 'permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster.'"  *Id.* at 527 (quoting *Stewart v. Abend*,

---

[10] It bears repeating that Defendant has not pointed to—nor is the Court aware of—any cases ultimately concluding that social media terms of service worded like Twitter's established an express sublicense.  *See Yang*, 2024 WL 4706892, at *1-2 (making this observation).

495 U.S. 207, 236 (1990)).  Although common forms of fair use include making copies of a protected work "for purposes such as criticism, comment,  . . . , teaching . . . , scholarship, . . . research," or "news reporting," 17 U.S.C. § 107, the defense remains one that is "flexible" and "may well vary depending upon context," especially "in light of the sometimes conflicting aims of copyright law," *Google*, 593 U.S. at 20.

Because the fair use doctrine operates as an affirmative defense to a copyright infringement claim, "the party asserting fair use bears the burden of pro[ving]" that it applies in a particular case.  *Authors Guild v. Google, Inc.* ("*Google Books*"), 804 F.3d 202, 213 (2d Cir. 2015) (first citing *Campbell*, 510 U.S. at 590; then citing *Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 918 (2d Cir. 1994)).  The availability of the fair-use defense, as a mixed question of law and fact, is properly addressed on a motion for summary judgment consistent with the usual Rule 56 standard.  *See Cariou v. Prince*, 714 F.3d 694, 704 (2d Cir. 2013).

For the reasons discussed below, the Court agrees with Plaintiff that there are no genuine disputes of material fact concerning fair use, and that the defense fails as a matter of law.  Plaintiff is therefore entitled to summary judgment on its copyright infringement claim against Defendant.

### 1.  The Purpose and Character of the Infringing Use

As mentioned, the first fair-use factor asks about "the purpose and character" of the infringing use, "including whether such use is of a commercial nature."  17 U.S.C. § 107(1).  This factor "focuses on whether an allegedly infringing use has a further purpose or different character, which is a matter of degree, and the degree of difference must be weighed against other considerations, like commercialism."  *Warhol II*, 598 U.S. at 525.  "A use that has a further purpose or different character is said to be 'transformative.'"  *Id.* at 529 (quoting *Campbell*, 510 U.S. at 579).  "The larger the difference" between the infringing secondary use and the original work—

that is, the more transformative the secondary use—"the more likely the first factor weighs in favor of fair use.  The smaller the difference, the less likely."  *Id.*; *see also Romanova v. Amilus Inc.*, 138 F.4th 104, 110-11 (2d Cir. 2025) ("Transformative uses are favored over those that risk to serve as substitutes for the original.").

Because the "same copying may be fair when used for one purpose but not another," it is crucial to examine the "justification" for the specific use challenged.  *Warhol II*, 598 U.S. at 531-33.  Broadly speaking, "a use that has a distinct purpose is justified because it furthers the goal of copyright, namely, to promote the progress of science and the arts, without diminishing the incentive to create"; by contrast, a "use that shares the purpose of a copyrighted work" is "more likely to provide 'the public with a substantial substitute for matter protected by the copyright owner's interests in the original work or derivatives of it,' which undermines the goal of copyright."  *Id.* at 531-32 (citation modified) (quoting *Google Books*, 804 F.3d at 207).  Thus, "where an original work and copying use share the same or highly similar purposes," the copier must show an "independent justification" that "copying is reasonably necessary to achieve the user's new" but substantially similar "purpose."  *Id.* at 532.  Such an independent justification exists, for example, in parody, which "needs to mimic an original to make its point."  *Id.* (quoting *Campbell*, 510 U.S. at 580-81).  And "other commentary or criticism that targets an original work may have compelling reason to 'conjure up' the original by borrowing from it."  *Id.* (quoting *Campbell*, 510 U.S. at 588).

The Second Circuit in *Romanova* recently elaborated on the independent-justification requirement.  As it explained, "justification is often found when the copying serves to critique, or otherwise comment on, the original [work] or its author."  *Romanova*, 138 F.4th at 115, 119.  But criticism and commentary about the copyrighted work are not the only sufficient justifications;

others include "where the copying provided information to the public about the copied work, or enabled the furnishing of valuable information on any subject of public interest, or rendered a valuable service to the public." *Id.* at 115-19 (collecting cases). And there "may well be other effective justifications," as "[l]ike the rest of the fair use analysis, whether a justification is sufficient 'calls for case-by-case analysis' and 'is not to be simplified with bright-line rules.'" *Id.* at 118 (quoting *Campbell*, 510 U.S. at 577). In any event, "there must be" some sufficiently weighty "*justification* for copying, which, but for the finding of fair use, would likely infringe the exclusive rights of the rights holder." *Id.* at 119; *see also id.* at 118 (twice stressing "the importance to fair use of a justification for the copying").

Finally, "the fact that a use is commercial as opposed to nonprofit is an additional element of the first factor." *Warhol II*, 598 U.S. at 531 (internal quotation marks and citation omitted). While the "commercial nature of the use is not dispositive," it remains "relevant" and "is to be weighed against the degree to which the use has a further purpose or different character." *Id.*

Put together, "[i]f an original work and a secondary use share the same or highly similar purposes, and the secondary use is of a commercial nature, the first factor is likely to weigh against fair use, absent some other justification for copying." *Id.* at 532-33. The Court thus considers "whether the purpose of the [challenged] use [is] significantly different from that of the original" and whether it is "commercial in nature" before turning "to the strength of other justifications for the use." *Id.* at 533 n.8 (discussing *Google*, 593 U.S. 1).

### a. Transformative Purpose

In analyzing "the specific 'use' of a copyrighted work that is alleged to be 'an infringement,'" the Court assesses "the degree of similarity between the specific purposes of the original work and the secondary use at issue." *Id.* at 533, 535 n.11 (citation omitted). In *Warhol*

*II*, for instance, the Supreme Court found that the original work and secondary use "shared" the same "objectives," such that their purposes were "substantially the same": both were "portraits" of the artist Prince "used in magazines to illustrate stories about Prince." *Id.* at 534-36.  That was true "even if the two were not perfect substitutes." *Id.* at 536.  Similarly, in *Hachette Book Group, Inc. v. Internet Archive*, the Second Circuit explained that the allegedly infringing "digital books serve the same exact purpose as the [analog] originals: making authors' works available to read." 115 F.4th 163, 181 (2d Cir. 2024).

Here, the purposes of Plaintiff's copyrighted Videos and Defendant's reproduction of the Videos in embedded tweets are exactly the same: to "document" the "current and newsworthy events" that are the subject of those Videos.  *Compare* Pl. 56.1 Stmt. ¶¶ 28, 46, 64, 77, 93, *with* Deft. SJ Brief at 23 (acknowledging that "each news article at issue uses embedded Tweets" to "discuss[]" the "subject matter of the embedded videos").  And although Defendant invokes "news reporting" as a transformative purpose, *e.g.* Deft. SJ Brief at 24 (quoting 17 U.S.C. § 107), such a purpose is not transformative where, as here, the purpose of the original Videos was undisputedly news reporting, too.  *See Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014) (explaining that in "the context of news reporting," courts find that "faithfully reproduc[ing] an original work without alteration" is transformative "by emphasizing the altered purpose or context of the work").  "Using a photo for the precise reason it was created does not support a finding that the nature and purpose of the use was fair," even in the context of news reporting.  *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 407 (S.D.N.Y. 2016).

Relying on the fact that the Videos were embedded in tweets, Defendant tries to transmute this shared purpose: "the Videos are transformed by their inclusion as embedded tweets in the

articles," Defendant claims, because the articles report not only on the Videos' subject matter but also the surrounding "social media controversies," to which the embedded tweets "provide[] readers with easy access." Deft. SJ Brief at 23-26. This argument "misunderst[ands] the test for transformativeness." *Romanova*, 138 F.4th at 118. "The test turns on whether *the copying of the original* communicates a message that differs from the message of the original—not whether the copier separately declares such a message." *Id.* at 118-19.

*Romanova* is instructive. There, the copyrighted photograph was of a woman wrapped up with two snakes; it was reproduced in an allegedly infringing article which purported to "communicate[] the fact that there was a growing trend on the internet to publish pet photos—a message not communicated by the original image." *Id.* at 107-08, 118. The Second Circuit rejected this difference's relevance, since the infringer's "republication of the snake image did not show that there was a growing trend to publish pet photos online," as "[t]he only support in its publication for that proposition was [its] statement to that effect." *Id.* at 119. Nothing about the transformative-purpose test, the court continued, "implied that a copying would be deemed transformative, favoring a finding of fair use, merely because the copier, *separate from the act of copying*, asserted a fact about the original not asserted by it." *Id.* (emphasis added). So the infringer's "unauthorized copying and distribution of the image communicated no message other than what the original image communicated," notwithstanding what the infringer separately "said about Plaintiff's image." *Id.*

Just so here. Defendant's articles may "separately declare[]" that there are social media controversies surrounding the subjects of Plaintiff's Videos, but copying those Videos—even in embedded tweets—did not do so. As Plaintiff points out, Defendant cites no evidence from the sole fact of the tweets' existence that they are part of a larger social media controversy on any

social media platform, let alone multiple platforms.  Pl. SJ Reply at 13-14.  For instance, while the article based on the Puppy Video states that it "was shared on Reddit and several other social media platforms," nothing in the embedded tweet itself conveys that message.  Fedun Decl., Exh. 23 at LM069-070.  Instead, the articles included the embedded tweets for the same reason the Videos within those tweets were taken: to report on the Videos' content.  That the original Videos and embedded tweets "were not perfect substitutes" does not change this conclusion.  *Warhol II*, 598 U.S. at 535-36; *accord Hachette Book Grp.*, 115 F.4th at 181 (finding that the original and secondary uses "serve[d] the same exact purpose" even though there was "some change involved in the conversion of print books to digital copies" (internal quotation marks omitted)).

### b.  Commercial Nature

It also undisputed that the infringing uses are "of a commercial nature."  *Warhol II*, 598 U.S. at 537 (quoting 17 U.S.C. § 107(1)).  "The crux of commerciality "is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price."  *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985).  Defendant is a "for-profit media company."  Pl. 56.1 Stmt. ¶ 8.  And its articles containing the embedded tweets are replete with commercial advertisements.  Fedun Decl., Exhs. 8, 15, 23, 30, 37.  Together, such facts sufficiently establish commerciality, *see, e.g.*, *Nixon*, 2024 WL 5202514, at *6; *Nicklen*, 551 F. Supp. 3d at 196, and Defendant does not contend otherwise, instead arguing that commerciality "is not dispositive here," Deft. SJ Brief at 25 n.6.  True enough.  But the "undisputed commercial character" of these uses, "though not dispositive, 'tends to weigh against a finding of fair use.'"  *Warhol II*, 598 U.S. at 537 (quoting *Harper & Row Publishers*, 471 U.S. at 562); *accord Romanova*, 138 F.4th at 120 (explaining that copying "done for a commercial purpose, . . . while not dispositive, is more helpful

to Plaintiff than to Defendant").  And "although a use's transformativeness may outweigh its commercial character, here, both elements point in the same direction."  *Warhol II*, 598 U.S. at 538.

### c.  Justification for Copying

"Taken together," that the original Videos and embedded tweets "share substantially the same purpose" and that Defendant's use of Plaintiff's Videos "was of a commercial nature[] counsel against fair use, *absent some other justification for copying*."  *Id.* at 537-38 (emphasis added).  That is, the first fair-use factor may be satisfied notwithstanding these countervailing interests if an infringer can provide "a further justification" for the copying.  *Id.* at 539.  Indeed, when the secondary use "is so similar" to the original use, "a particularly compelling justification is needed."  *Id.* at 547.  One such justification, the Supreme Court explained in *Warhol II*, is where "the original copyrighted work is, at least in part, the object of [the copier's] commentary," in that the copying use "'conjures up' the original work to 'shed light' on the work itself, not just the subject of the work."  *Id.* at 540 (citation modified) (quoting *Campbell*, 510 U.S. at 579, 588).

In the context of news reports involving "copyrighted image[s] or video[s]," this justification is expressed as the use "serv[ing] to illustrate criticism, commentary, or a news story *about* that [visual] work."  *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017).  For example, "a depiction of a controversial photograph might fairly accompany a work of commentary or criticism about the artistic merit or appropriateness of the photograph."  *Id.* (citing *Nunez v. Caribbean Int'l News Corp.*, 235 F. 3d 18, 25 (1st Cir. 2000)).  Or "a news report about a video that has gone viral on the Internet might fairly display a screenshot or clip from that video to illustrate what all the fuss is about."  *Id.* (citing *Konangataa v. Am. Broad. Cos.*, No. 16 Civ. 7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017)).  In

such cases, "*the copyrighted work is itself* the subject of the story." *Id.* (emphasis added).

This is not such a case. Defendant states that the articles are "reporting, critiquing and commenting on what is contained in the videos, and on the fact that the videos themselves are generating social media discussion," Deft. SJ Brief at 24—such that "[e]mbedding a social media post that contains a copyrighted photograph (or video) in a news story discussing a controversial event is more akin to reporting on a copyrighted work than merely describing the contents of such a work," Deft. Cross Motion Reply at 9. But those statements confirm Defendant's confusion: here, "the *contents* of the [Videos] are of some public interest," not the Videos themselves. *BWP Media USA*, 196 F. Supp. 3d at 406 n.6. After all, Defendant even acknowledges that the Videos "lack[] commentary" and are "just a raw recording of an event." Deft. SJ Brief at 23. So while certain events depicted in the Videos may be "controversial," Deft. Cross Motion Reply at 9, "[n]ewsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job," *BWP Media USA*, 196 F. Supp. 3d at 406 n.6. Courts in this Circuit roundly agree that simply reporting on the contents of visual media is an insufficient justification for copying that media. *See, e.g.*, *Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 61-62 (E.D.N.Y. 2021); *McGucken I*, 464 F. Supp. 3d at 606; *Cruz v. Cox Media Grp., LLC*, 444 F. Supp. 3d 457, 468-69 (E.D.N.Y. 2020); *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 428 (S.D.N.Y. 2018); *Ferdman*, 342 F. Supp. 3d at 532-34; *Barcroft Media*, 297 F. Supp. 3d at 351-52; *BWP Media USA*, 196 F. Supp. 3d at 406-07 & n.6.[11]

---

[11] The line of cases Defendant cites, *see* Deft. SJ Brief at 24-25, stands for the exception that proves this general rule: those cases found proper justification where "an individual's decision to disseminate" *the social media post* is "'the very thing the article is reporting on.'" *Whiddon v. Buzzfeed, Inc.*, 638 F. Supp. 3d 342, 352 (S.D.N.Y. 2022) (citation modified) (quoting *Walsh*, 464 F. Supp. 3d at 582); *Boesen v. Utd. Sports Publ'ns, Ltd.*, No. 20 Civ. 1552 (ARR), 2020 WL 6393010, at *4 (E.D.N.Y. Nov. 2, 2020)). The articles at issue here do not report on the tweets

Without the usual commentary-or-critique justification, Defendant broadens its lens: its "reporting" in the articles, it argues, went "beyond mere 'descriptive recitation' by providing substantial cultural, political, and historical context that transforms the meaning and significance of the underlying video content."  Deft. SJ Brief at 32; Deft. Cross Motion Reply at 7-10.  As a factual matter, the Court is skeptical that this is true of all the Videos.  *See* Fedun Decl., Exh. 23 at LM068-069 (Defendant's article with the tweet embedding the Puppy Video, all but exclusively reporting on the contents of that video).  But drawing all reasonable inferences in Defendant's favor, as the Court must at summary judgment, this argument still fails as a matter of law.  The Ninth Circuit rejected this exact justification—that an "article is transformative because its various tangents 'provided context,' with information about related topics that was 'much more expansive' than the photographs themselves"—as having "little support in fair use doctrine."  *McGucken v. Pub Ocean Ltd.*, 42 F.4th 1149, 1160 (9th Cir. 2022).  Under Defendant's theory, "it is hard to imagine what would *not* be a fair use, or what could not be readily turned into a fair use":

> Any copyrighted work, when placed in a compilation that expands its context, would be a fair use.  Any song would become a fair use when part of a playlist.  Any book a fair use if published in a collection of an author's complete works.  It would make little sense to treat this kind of "recontextualizing" or "repackaging" of one work into another as transformative.

*Id.*  The Second Circuit echoed that sentiment in *Romanova*, explaining that "[l]ittle would remain of an author's copyright protection if others could secure the right to copy and distribute a work simply by asserting some fact about the copied work."  138 F.4th at 119.

---

sharing the Videos themselves; nor do they "focus[]" on those tweets' (or the videos') "popularity."  *Cf. Nicklen*, 551 F. Supp. 3d at 197.  In holding that "embedding social media posts that incidentally use copyrighted images *in reporting on the posts themselves* transforms the original works," the cases Defendant cites indeed "align[] with well-settled case law" and do "not give publishers free reign to copy and paste copyrighted images at whim whenever they appear on" social media.  *Boesen*, 2020 WL 6393010, at *5.

Because courts must avoid "an overbroad concept of transformative use, one that includes any further purpose, or any different character," *Warhol II*, 598 U.S. at 529, they must instead make "a fine-grained analysis of each use" rather than "a blanket conclusion about the [article] as a whole," *Pub Ocean*, 42 F.4th at 1160.  The Court thus agrees with the Ninth Circuit and others in this Circuit that "the topics" in Defendant's articles "beyond the [Videos' subjects] have little bearing on transformation"; that "these other topics are discussed in other portions of the article does not alter [the] conclusion that [Plaintiff's Videos] are used simply to illustrate the [subjects] and therefore lack any transformative character."  *Id.*; *accord Cruz*, 444 F. Supp. 3d at 467-68 (rejecting a similar justification); *Otto*, 345 F. Supp. 3d at 428-29 (same).  Nor does the Court "believe that this is an 'extraordinary case' in which the need for news reporting should take precedence over copyright protections."  *Otto*, 345 F. Supp. 3d at 428 (citation omitted); *cf. Time Inc. v. Bernard Geis Assocs.*, 293 F. Supp. 130, 146 (S.D.N.Y. 1968) (finding justification for copying frames of the Zapruder film given "[the] public interest in having the fullest information available on the murder of President Kennedy").  All told, Defendant fails to provide a sufficient independent justification for copying the Videos, let alone the "particularly compelling" one "needed" given the shared purposes between the infringing uses and the originals.  *Warhol II*, 598 U.S. at 547.

At bottom, "the first statutory fair use factor decidedly favors the Plaintiff.  Not only did the Defendant copier flunk the tests of transformativeness of the copying and of need to show justification for the copying, but its copying was done for a commercial purpose, which, while not dispositive, is more helpful to Plaintiff than to Defendant."  *Romanova*, 138 F.4th at 120.

## 2.   The Nature of the Copyrighted Work

Under the second fair-use factor, "courts consider (i) whether the work is expressive or creative, with 'greater leeway being allowed to a claim of fair use where the work is factual or informational'; and (ii) 'whether the work is published or unpublished, with the scope of fair use involving unpublished works being considerably narrower.'"  *Hachette Book Grp.*, 115 F.4th at 187 (quoting *Blanch v. Koons*, 467 F.3d 244, 256 (2d Cir. 2006)).  "This factor recognizes that 'some works are closer to the core of intended copyright protection than others.'"  *Id.* (quoting *Campbell*, 510 U.S. at 586).  But the Second Circuit has repeatedly cautioned that this "second factor . . . rarely play[s] a significant role in the determination of a fair use dispute," *Google Books*, 804 F.3d at 220, such that it "is not dispositive," *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014).

Plaintiff concedes that "the Videos are factual in nature and were published."  Pl. SJ Brief at 15.  While Plaintiff claims that this renders the second factor "neutral," *id.*; Pl. SJ Reply at 19, Defendant argues that the factor lands in its favor because in addition to being published, the Videos "are obviously factual," Deft. SJ Brief at 33.  But the "general statement" that "the second factor tends to favor fair use when the copied works are factual, rather than fictional" is "an oversimplification."  *Hachette Book Grp.*, 115 F.4th at 187.  As the Second Circuit colorfully explained, "*Wind Power for Dummies* may contain factual information regarding the mechanics of wind power, but the author's compilation of those facts into a book suitable for the average 'dummy' is an original expression that the Copyright Act protects."  *Id.*  Thus, while certain copyrighted works "undoubtedly convey factual information and ideas, they also represent the authors' original expressions of those facts and ideas—and those 'subjective descriptions and portraits' reflect 'the author's individualized expression.'"  *Id.* (quoting *Harper & Row Publishers*,

471 U.S. at 563-64).

Here, while the Videos "purport[] to depict reality and w[ere] made publicly available before the challenged use[s]," Fedun's "videography reflects h[er] artistic choices of camera angle, exposure settings, and video length, among other things." *Nicklen*, 551 F. Supp. 3d at 197; *see* Pl. 56.1 Stmt. ¶¶ 21, 39, 58, 91 (explaining that in creating the Lynch, Staten Island, Puppy, and Protest Videos, "Fedun personally selected every creative element of the work including the subject matter, filming location, timing, lighting, angles, perspectives, depths, lens, and camera equipment"). So "[t]his factor does not weigh strongly for or against fair use," especially in light of Plaintiff's concession that the factor is neutral. *Nicklen*, 551 F. Supp. 3d at 197; *see also McGucken I*, 464 F. Supp. 3d at 607-08 ("Given that the Photograph's creative nature leans in Plaintiff's favor, while its prior publication weighs in Defendant's favor, the Court views the second factor essentially as a wash."); *cf. Hachette Book Grp.*, 115 F.4th at 187 (finding that this factor favored the copyright holders where the copyrighted works, "though published" and "undoubtedly convey[ing] factual information and ideas," also "represent[ed] the authors' original expressions of those facts and ideas" and the defendant argued "that this factor weighs neutrally").

### 3.  The Amount and Substantiality of the Infringing Use

The third fair-use factor compares what and how much the infringing use copies with "the copyrighted work as a whole." 17 U.S.C. § 107(3).  This inquiry assesses "the quantity" of the copyrighted materials the infringement uses, along with "their quality and importance, too." *Campbell*, 510 U.S. at 586-87.  "Generally, a finding of fair use is more likely when 'small amounts, or less important passages of the work are copied than when the copying is extensive, or encompasses the most important parts of the original.'" *Hachette Book Grp.*, 115 F.4th at 187 (citation modified) (quoting *Google Books*, 804 F.3d at 221).  "Still, there is no bright line rule

separating permissible from impermissible copying," as it is sometimes "necessary to copy the entirety of a work in order to achieve a legitimate, transformative secondary purpose." *Id.* at 188. "The crux of the inquiry," then, "is whether 'no more was taken than necessary.'" *HathiTrust*, 755 F.3d at 98 (quoting *Campbell*, 510 U.S. at 589).

Defendant concedes that it "published each of the embedded Tweets"—including the Videos—"in full." Deft. Cross Motion Reply at 12. Said otherwise, it is undisputed that "Defendant took the entirety of Plaintiff's work," and "[w]hile that fact alone is not fatal to a claim of fair use, Defendant cannot escape liability on the ground that it took only a small part of the protected work." *Romanova*, 138 F.4th at 120.

Defendant has two responses, but neither persuades. First, Defendant argues that it "could not have used any other video because [other videos] would not have accomplished the purpose of the use—to report and comment on what was being widely disseminated on social media." Deft. SJ Brief at 35; Deft. Cross Motion Reply at 12 ("[T]he embedded Tweets were provided in [Defendant's] news articles to allow readers to directly access the controversy discussed in the articles."). But "this argument hinges entirely on [Defendant's] assumption that its use of the [Videos] is transformative." *Hachette Book Grp.*, 115 F.4th at 188. As the Court has already rejected Defendant's transformative-use argument, it follows that the amount and substantiality of Defendant's wholesale copying "is not necessary to achieve a transformative secondary purpose." *Id.* at 188-89. This Court's peers have likewise rejected similar arguments when whole images were copied. *See, e.g.*, *Otto*, 345 F. Supp. 3d at 431; *Barcroft Media*, 297 F. Supp. 3d at 354; *BWP Media USA*, 196 F. Supp. 3d at 409.

Second, Defendant claims that by embedding the tweets containing the Videos, it "had no control" over including in its articles anything less than the full video. Deft. SJ Brief at 34-35; *see*

*also Richardson*, 2025 WL 89191, at *3 (suggesting, on a motion for judgment on the pleadings, that the infringer "could not reasonably have copied only a portion of the video" included in an embedded Twitter post). But the undisputed record evidence shows otherwise. For one, Defendant need not have "displayed" the Videos "in embedded Tweets" at all, as it could have chosen to "hide this media if editorially desired." Freeman Decl., Exh. K (Twitter's Developer Platform: "Embedded Tweets") at LM272. For another, Defendant could have simply relied on screenshots from the Videos, as it did at points for the Lynch and Staten Island Videos. Pl. 56.1 Stmt. ¶¶ 32, 50. As even Plaintiff acknowledges, "[h]ad Defendant merely taken screenshots of the Videos, rather than the entire videos themselves, then its argument may be entitled to credence." Pl. SJ Reply at 20. Another court in this District has rejected the argument that "embedd[ing]" an "entire" video was "necessary," as the infringer could have "provid[ed] a screenshot" or a "single image . . . rather than an embedded copy of the full work." *Nicklen*, 551 F. Supp. 3d at 198. This Court agrees.

Because Defendant "embedded the entire Video on [its] websites," and thus "reproduced the heart of the work, this factor weighs against fair use." *Id.*

### 4. The Effect of the Infringing Use on the Market for the Original Work

The fourth and final fair-use factor considers "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107. This factor typically "focuses on whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Google Books*, 804 F.3d at 223. Courts must consider "not only the market harm caused by the particular actions of the alleged infringer, but also the market harm that would result from unrestricted and widespread

conduct of the same sort." *Hachette Book Grp.*, 115 F.4th at 189 (internal quotation marks omitted). For example, it is widely accepted that "a copyright holder is entitled to demand a royalty for licensing others to use its copyrighted work, and that the impact on potential licensing revenues is a proper subject for consideration in assessing the fourth factor." *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 180 (2d Cir. 2018) (internal quotation marks omitted). Nevertheless, "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable when evaluating a secondary use's effect upon the potential market for or value of the copyrighted work." *Id.* (internal quotation marks omitted) (brackets in original).

In short, this factor turns on "whether the secondary use usurps the market of the original work," evaluating "the harm that results because the secondary use serves as a substitute for the original work." *HathiTrust*, 755 F.3d at 99 (internal quotation marks and citation omitted). Recall, too, that "the first factor relates to the problem of substitution—copyright's bête noire." *Warhol II*, 598 U.S. at 528. "In this way, the first factor relates to the fourth": "the first factor considers whether and to what extent an original work and secondary use have substitutable purposes, the fourth factor focuses on actual or potential market substitution." *Id.* at 536 n.12. Thus, there is a "positive association between the two factors" that is "fairly obvious," *id.*—"the more copying is done to achieve a purpose that is the same as or substantially similar to the original, the more likely it is that the copy will serve as a 'satisfactory substitute for the original,'" *Hachette Book Grp.*, 115 F.4th at 189 (quoting *Google Books*, 804 F.3d at 223). But that "relationship is not absolute," as certain "forms of straight copying may be fair if a strong showing on the fourth factor outweighs a weak showing on the first." *Warhol II*, 598 U.S. at 536 n.12. Because "the ultimate burden of proving that the secondary use does not compete in the relevant market is appropriately borne by

the party asserting the defense: the secondary user," *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith* ("*Warhol I*"), 11 F.4th 26, 49 (2d Cir. 2021), "even where a secondary use serves the same purpose as the originals, the defendant may present evidence of a lack of market harm to support their defense of fair use," *Hachette Book Grp.*, 115 F.4th at 191.

Had Defendant merely uploaded Plaintiff's Videos in its articles, the Court would easily find that this factor weighs against fair use. Displaying visual media "for the very purpose for which they were originally intended . . . necessarily usurps the function of the original works in the market." *Barcroft Media*, 297 F. Supp. 3d at 355 (citation modified); *accord Nixon*, 2024 WL 5202514, at *9; *see also Ferdman*, 342 F. Supp. 3d at 541 (applying a "presumption of market harm" under similar circumstances). It is undisputed that Fedun, Plaintiff's member and operator, had "experience in licensing her work to professional news reporting outlets," Pl. 56.1 Stmt. ¶ 2, and Plaintiff presents unrebutted evidence—through invoices and Defendant's own solicitations—of a licensing market in the Videos, *e.g.*, *id.* ¶¶ 29, 47; Fedun Decl. ¶ 61; Fedun Decl., Exh. 21 at IDNM000046-000047 (Fedun's emails with Defendant's video journalist regarding the Puppy Video). In the normal course, then, Defendant's articles would be "ready market substitute[s]" for Plaintiff's Videos "and the articles that would license them." *Pub Ocean*, 42 F.4th at 1164; *see also Ferdman*, 342 F. Supp. 3d at 541-42 (describing "the licensing of photographs to media outlets" as the "paradigmatic" market in such circumstances (internal quotation marks and citation omitted)).

But there is one wrinkle that gives the Court pause: the Videos were copied through embedded tweets. As one observer has noted, courts in this Circuit "that have handled embedded-content cases appear divided" on the appropriate substitute and its corresponding market effect. Moshe Friedland, Note, *It's Not Fair: Solving the Embedded Copyright Stalemate*, 2023 U. Ill. L.

Rev. 309, 344-45 (2023) (collecting cases).  One line of cases treats the entire embedded social media post—with the copyrighted image, "text," and other images included—as the substitute, thus finding it "implausible that Defendant's use would compete with Plaintiff's business or affect the market or value of her work."  *Walsh*, 464 F. Supp. 3d at 586; *see also Boesen*, 2020 WL 6393010, at *6.  Another has acknowledged an infringer's assertion that the use of an "embed code," which is purported to "produce[] a cropped, lower-resolution version" of the original, renders the copying an ineffective substitute, thus creating a triable issue of fact.  *McGucken III*, 2022 WL 836786, at *13.  Still a third has held that the "use of the copyrighted video, if widespread, would harm the licensing market for [the] video," as "[t]here would be no need for news outlets to license the video at all if each outlet could, without [the copyright holder's] prior authorization, embed the video from" social media.  *Nicklen*, 551 F. Supp. 3d at 198.

Based on the record and arguments before this Court, the Court agrees with the analysis in *Nicklen* that the embedded posts suffice to establish market harm.  Unlike *Walsh* and *Boesen*, where the Instagram posts including the copyrighted photo also incorporated text and other pictures, the tweets at issue here allow the article's reader to view the video unimpeded by "clicking on the video to watch it in a window in the embedded Tweet," as even Defendant acknowledges.  Deft. SJ Brief at 34-35.  And unlike *McGucken III*, Defendant does not argue that Twitter's embed code produces an ineffective, lower-resolution version of the video.  Defendant instead argues that a copyright holder "who allowed its work to be shared for free all over the internet, including on applications intended for sharing works, has no plausible basis to believe that they are harmed in terms of the market for licensing or selling works."  *Id.* at 36.  To the extent that this argument simply repackages Defendant's sublicense defense, *see id.* at 36-37; Deft. Cross Motion Reply at 13-14, it fails for the reasons expressed above, *see supra* III.B.  And to the extent,

rather, that this argument faults Plaintiff for "itself caus[ing] harm to the market for its work," Deft. SJ Brief at 36, the Court disagrees.

Under Defendant's theory, copyright holders would be presented with a Hobson's choice: share their work on social media and risk rampant copyright infringement through embedded posts, or keep their work private and risk failing to get their work noticed and, subsequently, licensed and paid for. *See Nicklen*, 551 F. Supp. 3d at 198. Tellingly, Plaintiff presented evidence of a media license for the "Staten Island Food Court Protest – Online Use, Twitter embed." Fedun Decl., Exh. 12. Defendant, perhaps, could have provided "empirical data" or other record evidence tending to show "a lack of market harm" through embedded posts. *Hachette Book Grp.*, 115 F.4th at 191-95. It did not do so here, even though "the burden of producing persuasive evidence of the absence of market harms falls to the infringer that invokes a fair use defense," *id.* at 194 n.11, and even though it needed to make a "strong showing" on this factor to "outweigh[] a weak showing on the first," *Warhol II*, 598 U.S. at 536 n.12. At least on the record presented, the Court concludes that "widespread adoption" of embedded posts copying the Videos "could overtake the market" for those Videos, *Nicklen*, 551 F. Supp. 3d at 198, because if outlets "could use such images for free, there would be little or no reason to pay for Plaintiff['s] works," *Barcroft Media*, 297 F. Supp. 3d at 355.

Finally, even when a copyright defendant "cannot disprove market harm," courts "still 'balance the benefit the public will derive if the use is permitted against the personal gain the copyright owner will receive if the use is denied.'" *Hachette Book Grp.*, 115 F.4th at 195 (citation modified) (quoting *Warhol I*, 11 F.4th at 48). The Court appreciates Defendant's argument that its "articles provide First Amendment protected commentary" and seek "to enlighten and inform the public about newsworthy events and the fact that there is social media discussion about them."

44

Deft. SJ Brief at 37.  But "the Second Circuit has consistently held that 'First Amendment concerns are protected by and coextensive with the fair use doctrine.'"  *Otto*, 345 F. Supp. 3d at 426 (quoting *Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 74-75 (2d Cir. 1999)).  And the Second Circuit has likewise "rejected the notion that merely expanding public access to a given work" and "creating the potential for further discussion regarding" such work "qualifies as a sufficient public benefit under the fourth factor."  *Nixon*, 2024 WL 5202514, at *9 (citing *Hachette Book Grp.*, 115 F.4th at 195-96).  The Court thus concludes that Defendant's copying does "not provide a sufficient public benefit to overcome the market harm" it caused.  *Id.*

### 5. Weighing the Factors

In evaluating fair use, "the final step is to weigh the four statutory factors together, along with any other relevant considerations."  *TVEyes*, 883 F.3d at 180.  Although the five copyrighted Videos were published "and straddle the line between creative and factual," *Nixon*, 2024 WL 5202514, at *10, the second fair-use factor is at best neutral.  And the other three factors counsel against fair use: Defendant's copying of the Videos served the same purpose as the Videos, was commercial, and lacked any other compelling justification; Defendant copied the Videos in their entirety; and in doing so, Defendant caused market harm absent any corresponding public benefit.  In short, "no statutory factor . . . favored a finding of fair use," nor "do the four statutory factors in the aggregate support a finding of fair use."  *Romanova*, 138 F.4th at 120.  "Having weighed the required factors," the Court "conclude[s] that the balance strongly favors [Plaintiff] and defeats the defense of fair use" as a matter of law.  *TVEyes*, 883 F.3d at 180-81 (so holding even where the "second factor is neutral").  So the Court grants Plaintiff's summary-judgment motion dismissing the fair-use defense and correspondingly denies that aspect of Defendant's cross-motion.

* * *

Because there is no dispute of material fact that Plaintiff has made a *prima facie* showing of copyright infringement, and Defendant's sublicense and fair-use defenses fail as a matter of law, the Court grants Plaintiff summary judgment on liability with respect to its copyright infringement claim against Defendant.

## D.   Willfulness

Although civil copyright infringement is a strict liability offense, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 89 (2d Cir. 2016), the Copyright Act provides that "[i]n a case where the copyright owner sustains the burden of proving, and the court finds, that infringement was committed willfully, the court in its discretion may increase the award of statutory damages to a sum of not more than $150,000."   17 U.S.C. § 504(c)(2).   "Copyright infringement is 'willful' if the plaintiff shows '(1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of "reckless disregard" for, or "willful blindness" to, the copyright holder's rights.'"   *Stokes v. MilkChocolateNYC LLC*, 681 F. Supp. 3d 226, 238 (S.D.N.Y. 2023) (quoting *Island Software & Comput. Servs., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005)); *see also Castillo v. G&M Realty L.P.*, 950 F.3d 155, 170 (2d Cir. 2020) ("A violation is willful when a defendant had knowledge that its conduct was unlawful or recklessly disregarded that possibility.").

Whether Defendant acted willfully in infringing Plaintiff's rights in the Videos "presents a factual issue not amenable to resolution through summary judgment in this case."   *Nixon*, 2024 WL 5202514, at *10.   True, certain facts that "may be relevant to proving willfulness" are undisputed, *id.*, and include Fedun and Defendant communicating as to licensing the Staten Island and Puppy Videos before Defendant copied those videos anyway.   Fedun Decl., Exh. 16 at

IDNM000036-000039, IDNM000089-000090; Fedun Decl., Exh. 21 at IDNM000046-000047. But there are other undisputed facts that tend to cut against willfulness, like Defendant's Code of Conduct, which instructs journalists on how to "use the internet or social media to obtain material for a story," including requiring them to "assess whether material can lawfully be reproduced or even drawn on without the consent of the rights holder and whether re-use of that material may carry a fee." Code of Conduct at IDNM000010-000011; Deft. 56.1 Stmt. ¶ 105. Still more are genuinely disputed, including whether "Defendant's journalists were instructed to embed Tweets through regular, and publicly available, [T]witter functionalities." Deft. 56.1 Stmt. ¶ 106 (citing Thomas Decl. ¶ 5); Pl. 56.1 Counter Stmt. ¶ 106.[12] Ultimately, "the Court cannot conclude that the present record establishes willfulness as a matter of law." *Nixon*, 2024 WL 5202514, at *10. The Court thus denies Plaintiff's motion for summary judgment as to willfulness.

## IV. Conclusion

For these reasons, Plaintiff's motion for summary judgment is granted in part and denied in part; Defendant's cross-motion for summary judgment is denied in full. The Court will hold an in-person status conference on October 22, 2025, at 2:00 p.m., in Courtroom 12D of the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, New York, NY 10007. The parties should be prepared to discuss a trial date and related trial logistics.

---

[12] While Plaintiff asks this Court to disregard Paragraph 5 of the Thomas Declaration as "self-serving," Pl. SJ Reply at 33-34, holding "that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off" a summary-judgment motion "would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50-51 & n.7 (2d Cir. 2022) (quoting *Danzer v. Norden Sys., Inc.*, 151 F.3d 50, 57 (2d Cir. 1998)). After all, "'there is nothing to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against' such a motion." *Id.* at 50 (citation modified) (quoting *Danzer*, 36 F.4th at 57). Nor is this one of the "rare cases" that "a party's declaration will not create a material issue of fact" where it is "blatantly contradicted by the record, so that no reasonable jury could believe it." *Id.* at 51 (internal quotation marks and citation omitted).

The Clerk of Court is respectfully directed to close the motions at Docket Numbers 38 and

44.

    SO ORDERED.

Dated: September 29, 2025
     New York, New York

                             JOHN P. CRONAN
                      United States District Judge